IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | 2:96-cr-0259-GEB |
| Plaintiff, ) | |
| ) | |
| v. ) | PRE-STATUS CONFERENCE |
| ) | COMMUNICATION |
| THEODORE JOHN KACZYNSKI, ) | |
| ) | |
| Defendant. ) | |

A status conference is scheduled to commence in this action at 11:00 a.m. on July 28, 2006. Ideally, input is received from the parties beforehand regarding the status of the action and proposals for resolving disputed matters. Since recent filings by the parties reveal several disputed matters exist, but not all of the parties have proposed how these matters should be resolved, this communication issues to delineate those matters before the status conference. See generally Fed. R. Civ. P. 16(a)(1)-(2) (indicating a status conference should "expedit[e] the disposition of the action" and "establish[] control so that the case will not be protracted because of lack of management").

## Background

The Ninth Circuit remanded "a request by convicted Unabomber Theodore John Kaczynski for the return of his papers and other property seized pursuant to a search of his Montana cabin in 1996

. . . [in order] for the government to propose a detailed, written plan to dispose of the property in question in a commercially reasonable manner calculated to maximize the [restitutory] return to Kaczynski's victims and their families." United States v. Kaczynski, 416 F.3d 971, 972 (9th Cir. 2005).[1] According to the remand decision, Kaczynski, and the victims and their families through appointed pro bono amicus counsel, are to be provided an opportunity to "comment upon" the plan proposed by the government. Id. at 977. The Ninth Circuit stated that "[i]f the government fails or refuses to provide such a plan within a reasonable period of time, or if its plan includes a finding of negligible value or results in a nominal, taxpayer-funded contribution to victim restitution, then the district court is directed to return Kaczynski's property to him." Id.

Following the remand, I filed an Order setting a status conference for September 19, 2006, and directed each party to file a status report no later than September 12, 2005, which addressed only the issues on remand and proposed a schedule for compliance with the Ninth Circuit remand decision.[2] (Order, Aug. 18, 2005.)

On September 12, 2005, the government filed a Status Report stating "the issues to be addressed on remand, as the United States understands them, are . . . identif[ication] of the property to be

---

[1] "Kaczynski pled guilty to a series of coldly calculated bombings that resulted in the loss of innocent life and numerous life-altering injuries. The plea agreement that spared Kaczynski his own life includes a restitution order" in the amount of $15,026,000. Id. at 972. "[T]he government received $7,025 towards restitution by selling Kaczynski's interest in his Montana land . . . ." Id. at 973 n.2.

[2] The Order explained that the status conference was not scheduled sooner because the process of appointing pro bono amicus counsel for the victims and their families had not yet been completed. (Order, Aug. 18, 2005.)

sold . . . [and] appointment of a receiver to prepare . . . on behalf of the United States, a commercially reasonable plan that maximizes the value of the property to be sold." (Gov't Status Report, Sept. 12, 2005, at 2.) As to the property to be sold, the government asserted Kaczynski "is primarily interested in his writings . . . and is apparently willing to dismiss any demand that [contraband, i.e. bomb making materials,] be sold or returned to him." (Id. at 3.) The government also stated that if Kaczynski "insists that all items be sold[,] rather than only his writings, the United States has caused the Federal Bureau of Investigations to prepare a list of the bomb making materials it seized from Kaczynski so that those items be excluded from the sale." (Id. at 3, n.4.) As to the appointment of a receiver, the government stated "Michael Burkart . . . has agreed to conduct a commercially reasonable sale of the property designed to maximize value, if the Court approves his appointment," and further averred "Mr. Burkart is prepared to submit to the Court a plan for sale of the property within forty-five days of his appointment by the Court." (Id. at 3.)

Kaczynski also filed a Status Report on September 12, 2005, in which he suggested "the Court provide the parties a few weeks to pursue possible settlement, before the government is required to submit its plan concerning disposition of [the seized] property." (Kaczynski Status Report, Sept. 12, 2005, at 1.) He also requested "two weeks, after the government submits its plan, to file any comments and/or objections to [the] plan." (Id. at 1-2.)

On September 16, 2005, the Ninth Circuit completed the process of appointing pro bono amicus counsel for the victims and their families. After learning of the appointment, I filed an Order

3

rescheduling the status conference to November 14, 2005, "to provide recently-appointed pro bono amicus counsel with time to become familiar with the issues and the directive of the Ninth Circuit [remand] opinion." (Order, Sept. 22, 2005, at 1.) The Order also required the government to clarify in a status report filed no later than November 7, 2005, its request for appointment of Mr. Burkart as a receiver since the government had "not indicate[d] why Court appointment [was] required, or whether such appointment would be pro bono or otherwise."[3] (Id. at 2.)

I subsequently issued a Stipulated Order continuing the status conference to December 12, 2005, because the parties represented that they needed "additional time to prepare for the hearing and to attempt settlement." (Order, Nov. 3, 2005, at 2.) Additional stipulated Orders continued the status conference until April 24, 2006, based on similar representations by the parties.

On April 17 and April 18, 2006, respectively, the government filed a Status Report and an Amended Status Report. The Amended Status Report commented on the various positions taken by the victims, but did not clearly specify which position, if any, the government proposed for the disposition of the seized property. (See Gov't Am. Status Report, April 18, 2006, at 2-5.) The Amended Status Report appeared to propose that "the United States gather all of Kaczynski's belonging[s]" and "**all** of [his] writings, including the copies and originals held by the University of Michigan," and then publically

---

[3] The Order also invited Kaczynski and pro bono amicus counsel to file a status report no later than November 7, 2005, "if they so choose, in order to comment on any matter consistent with the Ninth Circuit's remand directive." (Order, Sept. 22, 2005, at 2.)

4

"sell the non bomb-making related personal property as soon as the Court approves the appointment of the receiver and his plan of sale."[4] (Id. at 2-3 (emphasis in original).) The government also appeared to propose that the victims be allowed to "credit bid" before any public sale takes place, i.e. the victims could bid on and purchase property by applying Kaczynski's restitutory debt toward the purchase price. (Id. at 3-4.)

In addition, the government stated "the United States has no appropriations from which to pay the advertising and costs" of a sale, and that if a receiver was appointed, "the receiver will have to be paid by a percentage of the sale proceeds, an hourly rate, and reimbursement of out-of-pocket expenses, . . . [which] will have to come from the sale proceeds." (Id. at 4.) The government then asserted "without further direction from the Court, the United States does not know whether it should seek the appointment of a receiver and ask the receiver to prepare a plan for sale." (Id. at 6.)

Further, Mr. Burkart's email attached to the government's Amended Status Report indicated that Mr. Burkart's envisioned plan would attempt to maximize "the value of the personal writings by negotiat[ing] [an] arrangement to produce a motion picture and/or book concerning the 'Unabomber.'" (Id. Ex. 2.) Mr. Burkart also averred "that the amount of time required to accomplish this [objective] is impossible to estimate at this juncture," and that the fee for his

---

[4] The government indicated certain items would be excluded from the sale: writings describing victims' injuries or providing information on how to make bombs, as well as items Kaczynski used or planned on using to make bombs. (Gov't Am. Status Report at 2-3.) In addition, the government indicated the "victim-specific writings [would] be offered at no cost to the specific victim or that victim's survivors, regardless of whether that victim is named in the restitution order." (Id. at 2.)

work would be "an hourly rate of $200.00 plus a five percent (5%) commission computed on the net proceeds generated (after allowing for reimbursement of expenses attributed to the sale)." (Id.) In addition, he stated "[i]n the event that credit bids [by the victims] would be allowed . . . the prevailing bidder would be required to pay [a] commission based on the sale amount." (Id.)

Kaczynski filed objections to the government's Amended Status Report on May 26, 2006, in which he argued certain items the government proposed to include in the sale are beyond the scope of the Ninth Circuit's remand, and other items the government proposed to exclude from the sale should either be included or returned to him. (Kaczynski's Objections, May 26, 2006, at 2-4.) Specifically, Kaczynski argued "any proposal to auction off [his] property should not include other writings . . . that are not currently in the government's possession, such as those possessed by the University of Michigan," because those writings "are far beyond the scope of these proceedings concerning his motion for return of his seized property."[5] (Id.) Kaczynski also indicated he "is unsure of exactly what the government contends" should not be sold or returned to him because it constitutes "contraband." (Id. at 3, n.3.) Kaczynski asserted he "does not seek the return of per se contraband," but does seek return of "derivative contraband" and his seized firearms. (Id. at 4.)

In addition, Kaczynski argued the government's "proposals are deficient in failing to satisfy the Ninth Circuit's mandate that

---

[5] In addition, Kaczynski argued his "other writings" should not be included in a sale because "the restitution lien . . . does not apply to copies of his writings," and the seizure and sale of the writings "would violate the First Amendment and other substantial rights." (See Kaczynski's Objections, May 26, 2006, at 6-11.)

6

any plan show that it is likely to result in substantial money being distributed to the victims, and that, if not, the property be returned to Kaczynski." (Id. at 4.)  Kaczynski asserted "the plan is purely speculative" and would not "likely provide more than a nominal payment to the victims" because "the receiver requests an hourly rate of $200 plus a 5% commission of the net sale proceeds." (Id. at 5.)  He further contended that the proposed "credit bidding system" would not "maximize monetary return to the victims and their families . . . because when the victims purchase property in this manner, no money is raised for the victims" and "the victims would loose money . . . as they would still need to pay the 5% commission [to the receiver] on any successful bid." (Id. at 2-3 & n.3.)

On June 9, 2006, the government filed a response to Kaczynski's objections and the victims "join[ed] in the Government's response." (Victims' Resp. at 1.)  The government contended its proposal properly included all of Kaczynski's writings- not just those seized during the 1996 search of his Montana cabin-because "the restitution order attached to all his property and rights to property, including [his] writings which were in existence at the time he was convicted . . . . [and] any copies thereof." (Gov't Resp. at 2.)  In addition, the government argued "Kaczynski repeatedly represented . . . that he does not seek return of bomb making materials . . . [but] he keeps trying to backtrack from those representations." (Id. at 3.)  The government further asserted it "has not yet submitted a plan for sale" because "its original [status] report stated that 45 days after the appointment of the receiver, it would submit such a plan." (Id. at 4, n.2.)

7

1      A status hearing was held June 16, 2006, at which the
2 government, Kaczynski's counsel, and the victims' pro bono amicus
3 counsel were present. (Reporter's Transcript, Status Conference,
4 June 16, 2006, at 1.)  At the hearing, I asked the parties whether the
5 status of the matter was as stated in their various status reports.
6 (Id.)  The government responded that the parties "would like to have
7 an attempt at a settlement conference in chambers."  (Id.)  Although
8 Kaczynski's counsel initially agreed to a settlement conference, he
9 later stated that he was "not sure whether it would be appropriate to
10 do so before [me] or a different [judge]."  (Id. at 3.)  I declined to
11 serve as settlement judge, and counsel for the victims stated he was
12 not prepared to stipulate to the appointment of a separate judge.[6]
13 (Id. at 8.)

14      Counsel for the victims then solicited my thoughts on the
15 matters contained in the status reports.  (Id.)  In response, I issued
16 a tentative ruling "that the property at issue [on remand] is limited
17 to the actual property seized from Kaczynski's Montana cabin in 1996."
18 (Id. at 9.)  I stated that I would not express an opinion as to
19 whether credit bidding was within the rationale of the Ninth Circuit
20 remand decision, but I indicated that I was concerned the proposed
21 method of credit bidding might require a victim to pay Mr. Burkart a
22 substantial commission.  (Id. at 12.)  Finally, I questioned "whether
23 the government has proposed the type of plan the Ninth Circuit
24 contemplated."  (Id.)

---

[6] Local Rule 16-270(b) states "the assigned Judge . . . shall not conduct [a] settlement conference" unless "all the parties affirmatively request that the assigned Judge . . . participate in the conference and waive in writing any claim of disqualification on that basis to act as Judge . . . in the action thereafter . . . ."

8

1          In response, the government stated that "the reason [it] has
2   not proposed a detailed plan . . . is because [it] doesn't know
3   exactly what . . . [it is] to sell." (Id. at 14.)  The government
4   asserted it "need[ed] direction from the victims" since "the purpose
5   of the restitution order . . . is to bring benefit to the victims."
6   (Id. at 14.)  Counsel for the victims then "suggest[ed] we set a
7   fairly short deadline to come up with a kind of detailed proposal that
8   would satisfy the [Ninth Circuit remand decision]."  (Id. at 17.)  The
9   government and Kaczynski's counsel agreed, and the government was
10  given a deadline to file a document that proposed a plan consistent
11  with the remand decision and explained why such a plan should be found
12  timely.  (Id. at 22.)  Kaczynski and the victims were given an
13  opportunity to respond to the government proposal.  (Id. at 23-24.)
14         On July 7, 2006, the government filed a Status Report, in
15  which the victims joined.  (Victims' Statement at 1.)  In the Status
16  Report, the government proposes that the seized property be sold in a
17  modified "federal judicial execution sale," which would involve the
18  United States Marshal "contract[ing] with an entity . . . [to] sell
19  the property through an internet auction."[7]  (Gov't Status Report,
20  July 7, 2006, at 2.)  The government explains that "the Marshall
21  [would] request three bid proposals from companies which conduct
22  internet auctions."  (Id.)  The company selected by the Marshal would
23  "publicize the items to be sold and the terms of the auction," and
24  would be "paid a percentage of the sales proceeds, not to exceed 10%,
25  to cover . . . costs."  (Id.)  The government represents that the

---

[7] The government represents an internet sale, as opposed to a courthouse sale, "may increase the amounts bid for the sale items" because the internet sale would have "a longer period of exposure and bidding." (Gov't Status Report, July 7, 2006, at 2.)

Marshal "can request bid proposals and negotiate a final contract [for the auction] within sixty days" of receiving court-approval.[8] (Id.)

The government asserts some of the seized items should not be included in the auction or returned to Kaczynski, specifically, his writings containing "diagrams and 'recipes' for making bombs," as well as all of his firearms, ammunition, and "bomb-making materials." (Id. at 3-4.) Accordingly, the proposed auction would only include his "personal items" and the remainder of his writings. (Id. at 2-4.) The government contends the "personal items" are "likely to bring net proceeds to the named [v]ictims . . . [i.e.] the sales price of the items will exceed the costs of sale." (Id. at 3.) The government represents that the victims "intend to credit bid for any personal items . . . which do not sell."[9] (Id.) In addition, the victims request that certain information be redacted from the writings prior to the auction, specifically, the names of "all victims, regardless of whether they filed a restitution claim or not," "the names of their families," all "recognizable descriptions of the victims and their injuries," and the names of "intended victims."[10] (Id. at 4.)

---

[8] The Marshal "requests that he not take possession of the property to be sold nor be ordered to spend any funds in connection with the sale of the items," and requests that the Court approve a waiver of his "statutory commission." (Gov't Status Report, July 7, 2006, at 2.)

[9] The Marshal requests that if the victims want to credit bid, "that arrangements be established [prior to the auction] to insure payment of the auctioneer's commission." (Gov't Status Report, July 7, 2006, at 1.) The government's proposed plan does not explicitly address this issue.

[10] Victim Gary Wright objects to the auction unless he receives "ownership and possession" of the unredacted, original writings that refer to him and his injuries; however, he does not object to the sale of redacted copies at the auction. (Victims'
(continued...)

10

1        Finally, the government asserts in the Status Report that
2   its proposed plan is timely because the government could not submit a
3   concrete plan "until [it] knew precisely what the Named Victims wanted
4   to do and how the costs of the sale would be handled." (Id. at 5.)
5   In addition, the government explains that "settlement of the matter
6   was explored among the parties for several months."[11] (Id. at 6.)
7        On July 21, 2006, Kaczynski filed objections to the
8   government's proposed plan, in which he argues "the government has not
9   submitted a sufficient plan 'in a reasonable amount of time.'"
10  (Kaczynski's Objections, July 21, 2006, at 2.) Specifically,
11  Kaczynski argues the victims should not be permitted to credit bid on
12  any of his "personal items" that do not sell at the auction because
13  "[a]ny property that does not sell . . . by definition is of minimal
14  or no value" and "must be returned to [him]." (Id. at 4.) He also
15  contends his firearms and ammunition should be returned to him if the
16  government does not intend to sell the items.[12] (Id. at 2.) In
17  addition, he argues "the government should be required to show" that
18  the items the government asserts are bomb-making materials
19  "constitutes contraband per se; otherwise, [the government] should
20  return the property to [him]."[13] (Id. at 3.) Finally, Kaczynski

---

[10] (...continued)
Statement at 5.)

[11]   Kaczynski's counsel made a similar representation about the length of settlement negotiations at the status hearing on June 16, 2006. (Reporter's Transcript, Status Conference, June 16, 2006, at 19.)

[12]   Kaczynski's reference to firearms also appears to include ammunition. (Kaczynski Objections, July 21, 2006, at 2-3.)

[13]   Kaczynski states that he "does not seek the return of per
(continued...)

11

1  argues his writings should be returned because an auction of these
2  writings would violate the First Amendment.  (<u>Id.</u> at 4-7.)  Kaczynski
3  alternatively asserts that if the auction includes his writings, the
4  originals should not be redacted as requested by the victims and he
5  should receive unredacted copies.  (<u>Id.</u> at 8-10.)

Disputed Matters

Kaczynski indicates he believes the government has not proposed a commercially reasonable plan for the disposition of his seized property within a reasonable amount of time.  Although Kaczynski does not appear to oppose the proposed internet auction of his personal items, he does oppose including his writings in it and credit bidding by the victims after its completion.  In addition, Kaczynski contests the government's assertion that he is not entitled to have his firearms, ammunition, and derivative contraband either returned to him or auctioned.  Kaczynski has cited authority that purportedly supports his positions, but the government has failed to cite authority on most of its positions.

The parties should be prepared to discuss how these issues should be resolved at the status hearing on July 28, 2006.  If feasible, the government should file a proposed order concerning its

/////
/////
/////
/////

---

[13](...continued)
se contraband or any bomb-making materials," but argues that "many, if not all" of the items the government asserts constitute bomb making materials are actually "non-contraband items." (Kaczynski Objections, July 21, 2006, at 3.)

proposed internet auction of the seized personal items before 8:00 a.m. on July 28, 2006.

Dated:  July 27, 2006

/s/ Garland E. Burrell, Jr.
GARLAND E. BURRELL, JR.
United States District Judge