# FILED

AUG 1 0 2006

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
            DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
|                     Plaintiff, ) | 2:96-cr-0259-GEB |
|         v.                 ) | ORDER |
| THEODORE JOHN KACZYNSKI, ) | |
|             Defendant. ) | |

After convicted Unabomber Theodore John Kaczynski pled guilty "to a series of coldly calculated bombings that resulted in the loss of innocent life and numerous life-altering injuries," Kaczynski moved for return of his property that was "seized pursuant to a search of his Montana cabin in 1996 . . . ." United States v. Kaczynski, 416 F.3d 971, 972 (9th Cir. 2005). His motion was denied partly because of a ruling that a $15,026,000 restitution order, which had been entered in favor of certain victims and their families ("Named Victims") but had not yet been satisfied, constituted a lien on the property that defeated his motion. United States v. Kaczynski, 306 F. Supp. 2d 952, 955-56 (E.D. Cal. 2004).[1]

---

[1]     The Named Victims are those victims and their family members who submitted claims for restitution at the time of Kaczynski's sentencing.

1

1    On appeal, the Ninth Circuit stated that the restitution
2 order in favor of the Named Victims "gives the government a cognizable
3 claim of ownership" that "defeat[s] [the] motion for return of
4 property [only] 'if that property is needed to satisfy the terms of
5 the restitution order.'" Kaczynski, 416 F.3d at 974 (quoting United
6 States v. Mills, 991 F.2d 609, 612 (9th Cir. 1993)). Since the
7 government asserted the property had only "negligible value," the
8 Ninth Circuit concluded the government had not shown that the property
9 was needed to satisfy the restitution order. Id. at 975. The Ninth
10 Circuit stated that "[i]n the probable event" the property has more
11 than negligible value, "the government has a cognizable claim of
12 ownership sufficient to defeat [the] motion for its return" and "has
13 some degree of discretion as to how to enforce the restitution lien."
14 Id. at 976. But the Ninth Circuit found "neither [the government's]
15 actions . . . nor its . . . proposed restitution plan . . . [were
16 designed to obtain restitution for the Named Victims in a] reasonable
17 [manner]." Id. Therefore, the Ninth Circuit remanded the return of
18 property motion "to the district court . . . to give a timely and
19 adequate opportunity for the government to present . . . a
20 commercially reasonable plan to dispose of the property at issue, the
21 principal purpose of which shall be to maximize monetary return to the
22 [Named Victims]." Id. at 977. The Ninth Circuit stated that "[i]f
23 the government fails or refuses to provide such a plan within a
24 reasonable period of time, or if its plan includes a finding of
25 negligible value or results in a nominal, taxpayer-funded contribution
26 to victim restitution, then the district court is directed to return
27 Kaczynski's property to him." Id.

28

2

1    The Ninth Circuit also stated that Kaczynski, and the Named
2 Victims through appointed pro bono amicus counsel, were to be provided
3 an opportunity to "comment upon" the plan proposed by the government.
4 Id. The Ninth Circuit observed that the "viewpoints and desires" of
5 the Named Victims were "missing throughout this litigation" and should
6 be obtained since the "very purpose" of the restitution order "is to
7 provide financial compensation for their great losses." Id.

8    Upon remand, the government proposed a plan in a Status
9 Report filed September 12, 2005, ("September 12 Plan").[2] However, the
10 parties subsequently stipulated to multiple continuances of a Status
11 Conference regarding the plan, mainly to allow time for settlement
12 discussions. As a result, a Status Conference was not held until
13 June 16, 2006.[3]

14    At the Status Conference, I questioned whether the
15 September 12 Plan comported with the Ninth Circuit remand decision.[4]
16 The government responded that "the reason [it] ha[d] not proposed a
17 detailed plan . . . [was] because [it] d[id] know exactly what . . .
18 [it was] to sell." (Reporter's Tr. of June 16 Status Conf. ("RT")
19 at 14.) The government asserted it "need[ed] direction from the
20 victims" since "the purpose of the restitution order . . . is to bring
21 benefit to the victims." (Id. at 14.) Counsel for the Named Victims

22

23   [2] The content of the September 12 Plan is described in a
Pre-Status Conference Communication filed August 4, 2006.

24   [3] Before the Status Conference, the government filed an
25 Amended Status Report that provided more information about the
September 12 Plan. (See Pre-Status Conference Communication, filed
26 Aug. 4, 2006, at 4-6.)

27   [4] Even though the remand decision only concerned the seized
property already in the government's possession, the September 12
28 Plan appeared to contemplate taking any necessary action to gather
all of Kaczynski's writings from wherever they could be located.

1 then "suggest[ed] . . . a fairly short deadline [be set] to come up
2 with [the] kind of detailed proposal that would satisfy the [Ninth
3 Circuit remand decision]." (Id. at 17.) The government agreed,
4 Kaczynski's counsel acquiesced, and the government was given a
5 deadline to file a document that proposed a plan consistent with the
6 remand decision and explained why such a plan should be found timely
7 submitted. (Id. at 22.) Kaczynski and the Named Victims were given
8 an opportunity to respond to the proposal. (Id. at 23-24.)

9        On July 7, 2006, the government submitted another Status
10 Report, in which it proposed a markedly different plan ("July 7
11 Plan"). In the Status Report, the government asserted the July 7 Plan
12 was timely because the government could not submit a more concrete
13 plan "until [it] knew precisely what the Named Victims wanted to do
14 and how the costs of the sale would be handled." (Gov't Status
15 Report, filed July 7, 2006, at 5.) In addition, the government
16 explained that some delay was attributable to settlement negotiations,
17 which "the parties [explored] for several months."[5] (Id. at 6.)

18        The July 7 Plan proposed to sell Kaczynski's property in a
19 modified "federal judicial execution sale," which would involve the
20 United States Marshal "contract[ing] with an entity . . . [to] sell
21 the property through an internet auction." (Id. at 2.) The government
22 explained "the Marshal [would] request three bid proposals from
23 companies which conduct internet auctions." (Id.) The company
24 selected by the Marshal would "publicize the items to be sold and the
25 terms of the auction," and would be "paid a percentage of the sales
26

27        5    Kaczynski's counsel made a similar representation about
28 the length of settlement negotiations at the Status Conference on
   June 16, 2006. (RT at 19.)

4

1 │ proceeds, not to exceed 10%, to cover . . . costs."  (<u>Id.</u>)  The
2 │ government represented that the Marshal "can request bid proposals and
3 │ negotiate a final contract [for the auction] within sixty days" of
4 │ receiving court approval.[6]  (<u>Id.</u>)

5 │     In the July 7 Plan, the government divided the property at
6 │ issue into four categories--personal items, firearms, bomb-making
7 │ materials, and writings--and specifically identified the items of
8 │ property in each category.[7]  (<u>Id.</u> at 3-4.)  The government proposed
9 │ auctioning all of the personal items, and stated the Named Victims
10 │ "intend to credit bid for any personal items . . . which do not sell,"
11 │ i.e. the Named Victims would bid on and purchase property by applying
12 │ Kaczynski's restitutory debt toward the purchase price.[8]  (<u>Id.</u> at 3.)
13 │ The government asserted the firearms and bomb-making materials should
14 │ not be included in the auction nor returned to Kaczynski.  (<u>Id.</u> at 3-
15 │ 4.)  The government proposed auctioning all of the writings except
16 │ those containing "diagrams and 'recipes' for making bombs."  (<u>Id.</u>
17 │ at 4.)  Further, the government, on behalf of the Named Victims,
18 │ requested that certain information be redacted from the writings prior
19 │
20 │
21 │     [6]    The Marshal "request[ed] that he not take possession of
        the property to be sold nor be ordered to spend any funds in
22 │    connection with the sale of the items," and that the Court approve
        a waiver of his "statutory commission."  (Gov't Status Report,
23 │    filed July 7, 2006, at 2.)  These requests are addressed in a
        separate order authorizing the Marshal to assist in the approved
24 │    sale.

25 │     [7]    Lists of the specific items of property identified by
        the government as being personal items, firearms, and bomb-making
26 │    materials are attached to this Order.

27 │     [8]    "The Named Victims have indicated that they are willing
        to spend up to $7,000 to cover the costs of sale, including any
28 │    commissions due the auctioneer."  (Gov't Status Report, July 31,
        2006, at 3.)

1   to the auction, specifically, the names of "all victims, regardless of
2   whether they filed a restitution claim or not," "the names of their
3   families," all "recognizable descriptions of the victims and their
4   injuries," and the names of "intended victims."  (Id.)  Accordingly,
5   the government's proposed auction only included the personal items and
6   select, redacted writings.[9]

7           On July 7, the Named Victims filed a document that expressed
8   approval for the July 7 Plan, argued the proposed plan was timely, and
9   emphasized the need to redact the writings "to protect the[ir] . . .
10  privacy as well as the feelings and sensibilities of their loved
11  ones."[10]  (Named Victims' Statement Concerning Auction of Def.'s
12  Property, filed July 7, 2006, at 2.)

13          On July 21, 2006, Kaczynski filed objections to the July 7
14  Plan, in which he argued "the government has not submitted a
15  sufficient plan 'in a reasonable amount of time.'"  (Kaczynski's
16  Objections, filed July 21, 2006, at 2.)  Specifically, Kaczynski
17  argued the victims should not be permitted to credit bid on any of his
18  personal items that do not sell at the auction because "[a]ny property
19  that does not sell . . . by definition is of minimal or no value" and
20  "must be returned to [him]."  (Id. at 4.)  He also asserted his
21  firearms should be returned to him if the government does not intend

22

23          [9]    The government stated that all property not specifically
24  identified as personal items, writings, firearms, and bomb-making
    materials would be returned to Kaczynski.  (Gov't Status Report,
25  filed July 7, 2006, at 3.)

26          [10]   In a separate statement, Victim Gary Wright objected to
    the auction unless he receives "ownership and possession" of the
27  unredacted, original writings that refer to him and his injuries;
    however, he did not object to the sale of redacted copies at the
28  auction.  (Named Victims' Statement Concerning Auction of Def.'s
    Property, filed July 7, 2006, at 5.)

1  to sell the items at the auction. (<u>Id.</u> at 2.) He further argued "the
2  government should be required to show" that the items the government
3  asserts are bomb-making materials "constitute[] contraband per se,"
4  that is, items "'the mere possession of which is unlawful'";
5  otherwise, [the government] should return the property to [him]."
6  (<u>Id.</u> at 3 (quoting <u>United States v. Felici</u>, 208 F.3d 667, 670 (8th
7  Cir. 2000)).) Finally, Kaczynski asserted his original writings
8  should be returned to him because an auction of the originals would
9  violate the First Amendment. (<u>Id.</u> at 5.) Kaczynski alternatively
10  asserted that if the auction included his original writings, the First
11  Amendment prohibits redactions of the originals, and he should receive
12  unredacted copies. (<u>Id.</u> at 8-10.)

13         A Status Conference was held on July 28, 2006, at which
14  Kaczynski's counsel stated that Kaczynski did not oppose the July 7
15  Plan on timeliness grounds but that he did challenge its adequacy.
16  The government's oral argument included proposals and issues that were
17  not contained in the July 7 Plan; the government stated it would file
18  an amended plan to include these new items. Counsel for the Named
19  Victims joined in the government's positions and emphasized that the
20  Named Victims were "very concerned about the idea of any sale that
21  would not include the writings," stating "the writings . . . clearly
22  possess the bulk of the value for the victims."

23         On July 31, 2006, the government filed a Status Report
24  containing an amended plan that includes those items discussed at the
25  July 28 Status Conference ("July 31 Plan"). The July 31 Plan proposes
26  that the "firearms will be turned over . . . to the Named Victims and
27  [Kaczynski] will be credited three hundred [dollars] ($300.00) towards
28  his restitution debt." (Gov't Status Report, filed July 31, 2006,

7

1  at 4.)   The government states "the value being credited to [Kaczynski]
2  for the firearms is twice the value that the Defendant stated his
3  weapons were worth in his Rule 41 motion."  (Id.)  The government also
4  asserts "the Named Victims, who will receive the proceeds from [an]
5  auction, request that no bomb-making materials be sold."  (Id.)  The
6  government contends Kaczynski told the Ninth Circuit he was not
7  seeking the return of said items and that "prison regulations prohibit
8  Kaczynski from possessing these items."  (Id.)

9         Kaczynski filed a response to the July 31 Plan on
10  August 1, 2006.  In his response, Kaczynski argues the Named Victims
11  should not be allowed to "credit the restitution order for the value
12  of the firearms" and asserts that "if the firearms are not sold and
13  the proceeds given to the [Named Victims,] the firearms must be
14  returned to him through a designated representative." (Kaczynski's
15  Response, Aug. 1, 2006, at 1.)  Kaczynski also contends he is entitled
16  to the return of any unsold property, including those items
17  categorized by the government as bomb-making materials, unless those
18  materials "constitute 'per se contraband.'"  (Id. at 2.)

19        On August 4, 2006, the government filed a supplemental
20  document regarding the bomb-making materials, to which it attached
21  detailed descriptions and photographs of the items.  (Gov't Status
22  Report, filed August 4, 2006, Attach. 1-3.)

23        On August 9, 2006, the Named Victims filed a supplemental
24  document that asserts redaction of the original writings is necessary
25  not only to protect their privacy, but also to avoid the "painful
26  conflict" of "profiting from the sale of materials that identify and
27  discuss the injuries of specific, named individuals . . . ."
28  (Victims' Supplemental Submission, filed August 9, 2006, at 2.)

8

1 | ## DISCUSSION

2 At issue is whether the July 31 Plan satisfies the Ninth
3 Circuit remand directive that the government "propose a detailed,
4 written plan to dispose of the property in question in a commercially
5 reasonable manner calculated to maximize the monetary return to [the
6 Named Victims]." Kaczynski, 416 F.3d at 972. In the July 31 Plan,
7 the government describes how its proposed internet auction would be
8 effectuated and how the auction would likely "afford greater exposure
9 of the items for the greatest possible value." (Gov't Status Report,
10 filed July 31, 2006, Ex. A; id. at 2 (stating that an internet sale,
11 as opposed to a courthouse sale, "may increase the amounts bid for the
12 sale items" because the internet sale would have "a longer period of
13 exposure and bidding").) Since the government has described the
14 proposed internet auction in sufficient detail, and shown that the
15 auction is calculated to maximize monetary return to the Named
16 Victims, that portion of the July 31 Plan is approved. See Kaczynski,
17 416 F.3d at 972. A discussion of the items that may be included in
18 the approved internet auction follows.

19 ## I. Proposal as to Personal Items

20 The July 31 plan proposes to sell all of Kaczynski's
21 personal items and asserts that the sale of these items is "likely to
22 bring net proceeds to the Named Victims . . . [i.e.] the sales price .
23 . . will exceed the costs of sale." (Gov't Status Report, filed July
24 31, 2006, at 3.) Kaczynski does not challenge the sale of his
25 personal items, but he does object to credit bidding by the Named
26 Victims on any unsold items. Specifically, Kaczynski contends credit
27 bidding does not comport with the Ninth Circuit remand decision
28 because "any property that does not sell at an auction by definition

1  is of minimal or no value," and "must be returned to [him]."
2  (Kaczynski's Objections, filed July 21, 2006, at 4.)  This argument is
3  purely speculative and does not account for the possibility that the
4  property may have some value to the Named Victims.  If their credit
5  bids assign more than "negligible value" to the property, then the
6  "property is needed to satisfy the terms of the restitution order."
7  Kaczynski, 416 F.3d at 976 (indicating that property having more than
8  "negligible value" can be used to reduce the amount of restitution a
9  defendant owes a victim).

10          Kaczynski also argues the Ninth Circuit remand decision
11  prevents credit bidding because it will not result in monetary return
12  to the Named Victims.  Although the remand decision indicated the
13  "principal purpose" of the government's plan should be "to maximize
14  monetary return," the Ninth Circuit also stated that "the viewpoints
15  and desires" of the Named Victims were "missing throughout this
16  litigation" and indicated that their desires should be taken into
17  consideration.  Id. at 977.  The government represents the Named
18  Victims have expressed a desire to credit bid on any property that
19  does not sell during the internet auction.

20          The remand decision states that "the government has some
21  degree of discretion as to how to enforce the restitution lien," and
22  indicates that an "order of restitution may be enforced 'by all . . .
23  available and reasonable means.'"  Id. at 976 (quoting 18 U.S.C. §
24  3664(m)(1)(A)(ii)) (emphasis added).  Federal Rule of Civil
25  Procedure 69(a), which governs enforcement of a judgment for the
26  payment of money, states that the procedures used to enforce a
27  judgment "shall be in accordance with the practice and procedure of
28  the state in which the district court is held . . . ."  In California,

10

1   a judgment creditor may credit bid on property subject to a judgment
2   lien.  Cal. Code Civ. P. § 701.590(b).  Therefore, credit bidding is
3   an "available . . . means" of executing the unsatisfied restitution
4   order in favor of the Named Victims.  Kaczynski, 416 F.3d at 976.

5           Accordingly, the proposals in the July 31 Plan to sell the
6   personal items in the internet auction and to allow the Named Victims
7   to credit bid on unsold personal items are approved.

8   II.  Proposal as to Firearms

9           The July 31 Plan proposes that the firearms be "turned over"
10  to the Named Victims "and th[at] [Kaczynski] . . . be credit[ed] three
11  hundred [dollars] ($300.00) towards his restitution debt."  (Gov't
12  Status Report, filed July 31, 2006, at 4.)  Kaczynski does not
13  challenge this amount of credit, but argues "crediting" the
14  restitution order for the value of the firearms would be
15  "inconsistent" with the Ninth Circuit remand decision.  (Kaczynski's
16  Objections, filed August 1, 2006, at 1-2.)

17          The record does not indicate three hundred dollars of credit
18  for the firearms constitutes negligble value.  Consequently,
19  crediting Kaczynski this amount would not inconsistent with the Ninth
20  Circuit remand decision.  See Kaczynski, 416 F.3d at 976 (indicating
21  property having more than "negligible value" can be used to reduce the
22  amount of restitution a defendant owes a victim).  Therefore, the
23  proposal in the July 31 Plan to sell the firearms to the named Victims
24  for three hundred dollars credit is approved.

25   III.  Proposal as to Bomb-Making Materials

26          The July 31 Plan states "[t]he Named Victims . . . request
27  that no bomb-making materials be sold," and proposes to "appropriately
28  dispose" of all the bomb-making materials described on an attached

1  list.  (Gov't Status Report, filed July 31, 2006, at 4; id. Ex. D.)
2  Kaczynski argues he "does not believe the items on the list are
3  bomb-making materials," and asserts all of the items must be either
4  sold at the auction or returned to him unless "they constitute 'per se
5  contraband.'"  (Kaczynski's Response, Aug. 1, 2006, at 2.)  The
6  government rejoins that Kaczynski "represented to [the Ninth Circuit]
7  that he was not seeking the return of [these] items," and also asserts
8  the bomb-making materials cannot be returned to Kaczynski because
9  "prison regulations prohibit [him] from possessing [them]."  (Gov't
10  Status Report, filed July 31, 2006, at 4.)

11         The remand decision states "Kaczynski does not seek the
12  return of any property that constitutes contraband."  Kaczynski, 416
13  F.3d at 974, n.4.  Kaczynski argues the term "contraband" does not
14  include all items the government characterizes as bomb-making
15  materials because many of the items could be used for "legitimate,
16  lawful purposes."  (Kaczynski's Response, Aug. 1, 2006, at 2.)
17  However, even if Kaczynski is correct on this point, the property may
18  not be returned to him unless he establishes that he may lawfully
19  possess the items while in prison.  United States v. Van Cauwenberghe,
20  827 F.2d 424, 433 (9th Cir. 1987) (stating that "[t]o prevail on a
21  Rule 41[(g)] motion, a criminal defendant must demonstrate that . . .
22  he is entitled to lawful possession of the seized property").

23         Federal prison regulations prohibit Kaczynski from
24  possessing any "material prohibited by law, or by regulation, or
25  material which can reasonably be expected to cause physical injury or
26  adversely affect the security, safety, or good order of the
27  institution."  28 C.F.R. § 500.1(h).  The Bureau of Prisons has
28  interpreted this prohibition to include explosives, combustible or

12

1  flammable liquids, hazardous or poisonous chemicals, and material
2  which "present[s] a health, fire, or housekeeping hazard." Federal
3  Bureau of Prisons, U.S. Dep't of Justice, Program Statement No.
4  P5580.07 § 9 (Dec. 28, 2005).[11] The government's list of bomb-making
5  materials clearly contains items Kaczynski is prohibited from
6  possessing in prison, e.g. an "improvised explosive device," a "pipe
7  bomb," several plastic containers containing "acid," and numerous
8  containers of various chemical compounds. Kaczynski has not shown he
9  is entitled to lawfully possess any of the items identified by the
10 government as bomb-making materials. See Van Cauwenberghe, 827 F.2d
11 at 434 ("Absent a showing that the individual requesting return of
12 property under Rule 41[(g)] is entitled to its lawful possession, the
13 property may not be released to him."). Therefore, the proposals in
14 the July 31 Plan to exclude the bomb-making materials from the sale
15 and to not return the property to Kaczynski are approved.

16 IV.  Proposal as to Writings

17         The July 31 Plan states the Named Victims request that "the
18 diagrams and 'recipes' for making bombs be excluded from the sale and
19 not be returned to [Kaczynski]," and that all of the remaining
20 original writings be sold in redacted form. (Gov't Status Report,
21 filed July 31, 2006, at 5.) Kaczynski contends the sale of his
22 original documents would violate the First Amendment, even though he
23 already has or will receive copies of all of his writings, because an
24 "original is always better than a copy" and has "intrinsic historical

25
26
27

28         [11]  As of August 4, 2006, this document could be accessed at:
   http://www.bop.gov/DataSource/execute/dsPolicyLoc.

13

1  and scholarly value that photocopies lack."[12]  (Kaczynski's
2  Objections, filed July 21, 2006, at 4-7.)  However, Kaczynski has not
3  demonstrated what protected speech is contained in the originals that
4  is not contained in the copies, or how a sale of the originals, when
5  he possesses copies, implicates the First Amendment.  See Clark v.
6  Community for Creative Non-Violence, 468 U.S. 288, 293-94 n.5 (1984)
7  ("[I]t is the obligation of the person desiring to engage in
8  assertedly expressive conduct to demonstrate that the First Amendment
9  even applies.  To hold otherwise would be to create a rule that all
10  conduct is presumptively expressive.").  Therefore, the proposal to
11  sell the original writings is approved.[13]

12        Kaczynski alternatively argues that if the original writings
13  are included in the auction, the First Amendment prohibits the
14  government from redacting any information from the documents.
15  (Kaczynski's Objections, filed July 21, 2006, at 8-10.)  Again,
16  Kaczynski fails to explain how alterations of the original physical
17  documents, when he possesses exact copies, impairs his ability to
18  communicate his ideas or otherwise violates the First Amendment.  See
19  Clark, 468 U.S. at 293-94 n.5 (1984).

20

21
_____

22  [12]    Although the government states it has provided Kaczynski
    with copies of all of his writings, Kaczynski asserts that he is
23  missing some pages and that others are illegible.  The government
    shall provide Kaczynski, though his designated recipient, with any
24  page Kaczynski has not already received in readable form.   (See
    Kaczynski's Mot. for Return of Property at 52 (requesting that all
25  photocopies to be returned to a designated recipient).)

26  [13]    Kaczynski also argues "regardless of whether the
    government may sell Kaczynski's original papers, the restitution
27  lien does not take away [his] literary rights to his papers."
    (Kaczynski's July 21 Objections at 12.)  The July 31 Plan only
28  addresses the sale of the physical documents.

14

1 Furthermore, the Named Victims have requested the redactions
2 to protect their privacy and the "feelings and sensibilities of their
3 loved ones," as well as to avoid the "painful conflict" of "profiting
4 from the sale of materials that identify and discuss the injuries of
5 specific, named individuals . . . ." (Victims' Statement, filed July
6 28, 2006, at 2; Victims' Supplemental Submission, filed August 9,
7 2006, at 2.) The Ninth Circuit remand decision indicated "we must not
8 loose sight [of the Named Victims]" who are forced to "'suffer . . .
9 psychological . . . hardship first as a result of the criminal act and
10 then as a result of contact with a criminal justice system
11 unresponsive to the[ir] real needs . . . .'" Kaczynski, 416 F.3d at
12 976 (quoting the Victim and Witness Protection Act, Pub. L. No. 97-291
13 § 2(a)(2) (1982)). The Ninth Circuit also indicated that the proposed
14 plan should "serve the [Named Victims]" and should incorporate their
15 "viewpoints and desires." Id. at 976-77. Therefore, the proposal to
16 redact the names of all the victims and their families, all
17 recognizable descriptions of the victims and their injuries, and the
18 names of intended victims is approved.

19 In addition, the government's request to exclude Kaczynski's
20 writings that contain "diagrams and 'recipes' for making bombs" from
21 the auction is approved, but its request that these original writings
22 not be returned to Kaczynski is unsupported and contrary to the remand
23 decision. See id. at 977. Therefore, Kaczynski's original writings
24 containing "diagrams and 'recipes' for making bombs," most, if not all
25 of which he already has copies, shall be returned to the designated
26 recipient identified in Kaczynski's motion. (See Kaczynski's Mot. for
27 Return of Property at 52 (requesting that all property be returned to
28 a designated recipient).)

15

1                         CONCLUSION

2           For the stated reasons, the July 31 Plan is approved, except

3 as noted above. Property in the government's possession that is not

4 addressed in the July 31 Plan shall be returned to Kaczynski. A

5 separate order will issue authorizing the United States Marshal to

6 assist the government in organizing the sale.

7          IT IS SO ORDERED.

8
Dated: August 10, 2006
9

10                         /s/ Garland E. Burrell, Jr.
                          GARLAND E. BURRELL, JR.
11                         United States District Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16

# PERSONAL ITEMS

**Tools**

1.   File (Page 2)

2.   File with Red Handle (Page 2)

3.   Metal Files (Page 2)

4.   Pliers/vise grip (Page 12)

5.   Hatchet (Page 12)

6.   Knife (Page 13)

7.   Pocket knife (Page 14)

8.   Three tools (Page 15)

9.   Tools (Page 15)

10.   Small ratchet, tweezers and a pocket knife (Page 15)

11.   One wood handled knife (Page 17)

12.   Tools (Page 18)

13.   Hand tools (Page 19)

14.   Two spades/hand shovels (Page 19)

15.   Tool made with rebar (Page 19)

16.   Wooden handled hammer (Page 20)

17.   Saw blades (Page 20)

18.   Long bladed black handled knife (Page 20)

19.   Saw (handsaw) (Page 20)

20.   Wooden measuring instrument (Page 20)

21.   Tool box (Page 20)

22.   Radio Sonde - measures temp., humidity, etc. (Page 20)

23.   Welding mask (Page 23)

24.   Bow strings and arrows in a quiver (Page 23)

25.   Hand saw (Page 27)

26.   Wooden handled pocket knife (Page 28)

27.   Pick/Hatchet Tool (Page 28)

28.   Knife (Page 28)

29.   Hunting knife (Page 28)

30.   Wood handled file (Page 28)

31.   Seven large drill bits (Page 28)

32.   Great Neck #50 hacksaw (Page 28)

33.   One drilling base (Page 28)

34.   Hand saw (Page 28)

35.   Hand bowed wood saw (Page 30)

36.   Arrows (Page 32)

37.    12 saw blades (Page 32)

38.    Magnet (Page 34)

39.    Hand drill (Page 34)

40.    Metal files (Page 38)

41.    Grinding wheels (Page 38)

42.    Hack saw blade (Page 38)

43.    Pliers (Page 46)

44.    Two axes (Page 53)

45.    Forging pliers (Page 56)

46.    Red colored vice (Page 57)

47.    Clamp (Page 57)

48.    Three pairs of scissors (Page 18)


## Clothing

1.    Gloves (Page 1)

2.    Gloves (Page 2)

3.    Green coat (Page 3)

4.    Blue scarf (Page 6)

5.   Scarf (turquoise and green) (Page 6)

6.   Shoes - with double sole of different sizes (Page 13)

7.   Brown sweater (Page 13)

8.   Hat, brown bag, camouflage jacket, green pants and canvas jacket (Page 13)

9.   Poncho (Page 13)

10.   Brown rain coat (Page 13)

11.   Canvas green/brown face mask and black canvas face mask (Page 14)

12.   Red hat (Page 17)

13.   Green canvas U.S. Army backpack (Page 17)

14.   Blue zippered sweatshirt (Page 18)

15.   Blue hood and old towel (Page 18)

16.   Two pair of plastic glasses (Page 18)

17.   Blue jacket (Page 18)

18.   Green hooded jacket (Page 18)

19.   Northwest Territory hiking shoes (Page 21)

20.   Tan duffel bag

21.   Two duffel bags (Page 23)

22.   Black jacket (Page 23)

23.   (5) Pairs of Glasses (Page 59)

24.   Three mittens and two boots (Page 3)

## Personal Belongings

1.   Typewriter and brown case (Page 1)

2.   Typewriter (Page 21)

3.   Typewriter with gray case (Page 24)

4.   Recorder & case (Page 1)

5.   Black watch (Page 5)

6.   Watch (Page 5)

7.   Red "Le Watch" Brand Watch (Page 29)

8.   Montana driver's license (Page 5)

9.   Two books of checks in the name of Theodore J. Kazcynski (Page 6)

10.   Samsonite briefcase containing University of Michigan Degrees (Page 24)

11.   Yearbooks (Page 24)

12.   Leather portfolio (Page 12)

13.   Traveling kit (Page 5)

14.   Radio and map of Lincoln, MT., area (Page 14)

15.   Homemade calendar (Page 15)

16.   Backpack frame containing misc. pipes and cordage (Page 21)

17.    One "Hanson, Model 1509" scale (Page 25)

18.    Medallion (Page 57)

19.    Scabbard (Page 60)

Books

1884 Revisited (K2040-5)
201 Russian Verbs (K964-42)
3 Rivers North telephone book (K963-38)
A Finnish Grammar (K963-11)
Abundance for What? (K974-60)
Age of Metternich 1814 - 1848 (K964-3)
Alexander II and the Modernization of Russia  (K964-21)
Ancient World  (K964-33)
Ancient and Medieval Coins  (K964-48)
Ancient Near East (K974-66)
Ancient Engineers (K2040-2)
Annals of Imperial Rome  (K964-37)
Arabs in History (K974-27)
Argentina, Sociedad De Masas  (K964-26)
Asimov's Guide to the Bible (K2039-5)
Autobiography of Benvenuto Cellini (K2018-21)
Autopsy of Revolution (K974-2)
Axiomatization of the Theory of Relativity (K1075-17)
Baronial Household of the Thirteenth Century (K974-58)
Baroque Times in Old Mexico (K964-13)
Basic Conversational Russian (K963-7)
Beginner's Russian Reader  (K964-52)
Beginning Latin Book (K963-18)
Botany  (K1075-9)
Brothers Karamazov (K2019-12)
Caesar the Conquest of Gaul  (K964-15)
Caesar's Gallic War (K963-1)
Calculus (K1075-14)
Camping and Woodcraft  (K1075-5)
Cartas Finlandesas - Hombres Del Norte (K974-49)
Cassell's New Compact Latin Dictionary (K963-23)
Catalogo, 1987 (K974-8)
Celts  (K964-14)
Century Handbook of Writing (K963-29)
Chinese Political Thought in the Twentieth Century (K2040-1)
Comes the Comrade! (K2039-6)
Committee of Vigilance (K974-17)
Companion to Caesar (K963-30)
Companion to Vergil (K963-31)
Concise Russian and English Dictionary (K963-13)
Conquest of Mexico  (K964-45)
Conquest of Peru (K964-9)
Conquest of New Spain  (K964-46)

Controlling Knapweed  (K1075-2)
Cossacks and the Raid (K2019-25)
Count Your Calories (K963-21)
Course of the South to Secession (K974-63)
Crowd in History, 1730 - 1848  (K964-38)
Cuentos (K974-42)
Cuentos Y Relatos Del Norte Argentino (K974-41)
Daily Life in Ancient Rome (K964-10)
Darkness at Noon (K974-28)
David Copperfield (K2019-14)
Deerslayer (K974-40)
Defense Never Rests (K974-18)
Eastern Mysticism (K2039-4)
Edible Wild Plants  (K1075-21)
Edible Wild Plants (K1075-23)
Effects of Nuclear Weapons (K1075-18)
Egyptian Language (K963-15)
El Perfil Del Hombre Y La Cultura En Mexico (K974-37)
El Idioma Espanol En Sus Primeros Tiempos  (K964-19)
Electronics Made Simple (K1075-28)
Elementary Chinese  (K964-49)
Elementary Spanish Grammar (K963-32)
Elements of the Topology of Plane Sets of Points (K1075-36)
Elements of Style (K963-14)
Elizabethan World Picture (K974-48)
Esbozo de Una Nueva Gramatica de la Lengua Espanola (K963-4)
Espana Contemporanea - Lengua Y Cultura (K963-9)
Essential Works of Marxism (K974-12)
Essentials of Russian (K963-10)
Essentials of Electricity for Radio and Television (K1075-27)
Far from the Madding Crowd (K2019-22)
Field Guide to Rocky Mountain Wildflowers (K1075-25)
Field Guide to Trees and Shrubs  (K1075-4)
Field Guide to Western Birds (K1075-1)
Field Guide to Animal Tracts  (K1075-3)
First Aid Measures for Accidents and Antidotes of Poisons (K1075-37)
First Latin Reader (K963-24)
Florilegio de cuentos hispanoamericanos (K974-33)
Food, Nutrition and Diet Therapy (K963-37)
Forest People (K974-61)
French English English French Dictionary  (K964-27)
French Grammar  (K964-25)
French Revolution Conflicting Interpretations (K2018-14)
French Revolution, V 1, (K2018-1)
French Revolution, V 2, (K2018-2)

French Chivalry (K2018-18)
French Revolution (K2018-16)
Fundamentals of Analytical Chemistry (K1075-20)
Garden City, Seeds (K963-35)
General Chemistry for Colleges (K1075-26)
German Grammar (K964-44)
German English English German Dictionary (K964-32)
Germans (K2018-7)
Graphic Survey of Chemistry (K1075-29)
Great Short Works of Joseph Conrad (K2019-5)
Growing Up Absurd (K1008)
Guide to Common Mushrooms of British Columbia (K1075-6)
Guide to Common Edible Plants of British Columbia (K1075-7)
Gurney's 1996 Spring Catalog (K963-36)
Handbook of Chemistry and Physics (K1075-12)
Handbook of Greek Mythology (K974-20)
Hard Times (K2019-21)
Harmless People (K974-5)
Hatchet Men (K974-29)
Historia De La Civilizacion Espanola (K964-23)
Histories (Tacitus) (K964-41)
Histories (Herodotus) (K964-28)
History of the German Language (K2018-10)
History of Violence in America (K2040-3)
History of the First World War (K964-18)
History of the Middle Ages 284 - 1500 (K964-1)
History of England (K2018-17)
Hitler's Dictatorship and the German Nation (K2018-15)
Holy Bible Dictionary Concordance (K2039-3)
How to Know the Wild Flowers (K1075-15)
I.C.S. Reference Library, Mathematics Mechanics (K2019-1)
I.C.S. Reference Library, Link Mechanisms, et al, (K2019-2)
Idearium Espanol - El Porvenir De Espana (K974-3)
Individual Differences Traits & Factors (K974-52)
Information War (K974-21)
Intellectual Foundations of China (K974-31)
Introduction to Organic Chemistry (K1075-19)
Introductory Russian Grammar (K963-5)
Journal of a Trapper (K974-51)
Juan Valera (K974-44)
Julius Caesar (K2019-16)
Know your Rights (K974-16)
La Cronica Del Peru (K964-17)
La Rebelion de las masas (K974-10)
Lange's Handbook of Chemistry (K1075-11)

Last Days of Hitler (K2018-5)
Last of the Mohicans (K974-39)
Latin America and the Enlightenment (K964-20)
Latin Grammar (K963-16)
Latin Review Text (K963-19)
Latin Made Simple (K963-8)
Lena Seca (K2019-26)
Les Miserables, v 1, (K2039-1)
Les Miserables, v 2, (K2039-2)
Life on the Mississippi (K974-46)
Livy Books I and II (K964-30)
Logarithms (K1075-13)
Los relampagos de agosto (K974-57)
Lost Languages (K963-17)
Louis XIV and Twenty Million Frenchmen (K2018-11)
Making of the Middle Ages (K964-12)
Manners and Customs of Several Indian Tribes (K974-53)
Many Mexicos (K964-11)
Maximina (K2019-27)
Mechanics of Materials (K1075-31)
Medici (K2018-8)
Medieval Cities (K964-4)
Merchant of Venice (K2019-15)
Metamorphoses (K2019-18)
Metodo Espanol (K974-32)
Midcentury Revolution, 1848 (K964-24)
Modern Physics (K1075-32)
Mushroom Hunters Field Guide (K1075-35)
My Lives in Russia (K964-7)
My Life as an Indian (K974-50)
Napoleon Buonaparte Builder or Wrecker (K2018-13)
Napoleon (K2018-3)
Napoleonic Revolution (K2018-19)
New England Frontier Puritans and Indians 1620 - 1675 (K974-38)
New Understandings of Administration (K964-39)
Nigger of the Narcissus (K2019-6)
Nomads of the Long Bow (K974-64)
Nomads of South Persia (K974-47)
Non-Flowering Plant (K1075-16)
Norse Discovery of America (K974-34)
Nuer (K974-30)
Ochrana (K964-8)
Of Mice and Men (K2019-11)
Old Regime and the French Revolution (K2018-6)
Organization Man (K974-9)

Origins of the Latin American Revolutions, 1808 - 1826 (K964-22)
Orwell: 1984 (K974-19)
Paradise Below Zero (K963-27)
Parties and Politics in the Early Republic (K974-62)
Peloponnesian War (K964-31)
Peregrina y otros relatos (K974-43)
Pocket Russian Dictionary (K963-20)
Pocket Book of O. Henry Stories (K974-45)
Poisonous Plants of the United States (K1075-8)
Popular History of the Reformation (K964-34)
Practical Handbook of Spanish Commercial Correspondence (K963-3)
Primitive Medical Aid in the Wilderness (K963-33)
Prince and the Discourses (K974-55)
Prose Edda (K2019-17)
Psicopatologia de la Vida Urbana (K974-15)
Psychology of Women (K974-1)
Radical Tradition (K974-7)
Raggle Taggle (K2019-24)
Razor's Edge (K2019-9)
Recommended Dietary Allowances (K963-28)
Revolution and Reaction 1848 - 1852 (K964-35)
Rifle Shooting (K963-22)
Riverita (K2019-28)
Roman Imperial Coins (K964-5)
Roman Political Ideas and Practice (K964-2)
Russia A History (K964-6)
Russian book (K964-43)
Russian Book ? (K964-50)
Russian book ? (K964-53)
Russian People (K964-51)
Satires of Juvenal (K974-14)
Science of Fingerprints (K963-26)
Secret Agent (K2019-8)
Selected Lives and Essays - Plutarch (K964-47)
Sense and Nonsense in Psychology (K974-4)
Shadow-Line (K2019-7)
Short History of 20th Century England 1868 - 1962 (K974-36)
Siete Cuentos (K974-13)
Silas Marner (K2019-19)
Skeptical Inquirer, V 4, #2 (K974-25)
Skeptical Inquirer V 3, #3 (K974-26)
Skeptical Inquirer, V 14, #2 (K974-54)
Skid Road (K974-11)
Sobre La Libertad Humana (K964-16)
Southwest Montana telephone book (K963-39)

Spandau The Secret Diaries (K2018-12)
Spanish - English English - Spanish Dictionary (K963-6)
Spanish Stories (K974-56)
Stalking the Wild Asparagus (K1075-22)
Stories of the East (K2019-10)
Tale of Two Cities (K2019-13)
Technical Society (K974-22)
Text-book of Organic Chemistry (K1075-10)
Three Short Novels Heart of Darkness, Youth, Typhoon (K2019-4)
Tracking Dog (K963-25)
Treasure Island (K2019-20)
Tristan and Iseult (K2019-23)
True Believer (K2040-4)
Twelve Caesars (K964-29)
Two Lives of Charlemagne (K2018-4)
Typing for Beginners (K974-59)
Understanding Japanese Society (K974-65)
United States Government Manual (K963-2)
Using Pesticides Safely (K963-34)
Victory (K2019-3)
Vitalized Chemistry (K1075-30)
Viva Mexico (K974-35)
Western Montana Regional Telephone Directory (K963-40)
Why Lenin? Why Stalin? (K2018-9)
Wild Edible Plants of the Western United States (K1075-24)
Wild, Edible and Poisonous Plants of Alaska (K1075-34)
Wildlife of the Northern Rocky Mountains (K1075-33)
Winston Dictionary (K963-12)
World of the Maya (K964-36)
Year of Battles: A History of the Franco-German War of 1870-71, portion (K2018-20)
Your Right to Privacy (K974-6)
Zapata and the Mexican Revolution (K964-40)
Zetetic, V 1, # 2 (K974-23)
Zetetic, V 1, # 1 (K974-24)

# FIREARMS

1.    Rifle scope (Page 2)

2.    Hand-made gun with spent cartridge (Page 15)

3.    Bolt action 22 caliber rifle (Page 17)

4.    Remington Model .700 3006 #6292650 (Page 17)

5.    One .22 caliber revolver and nine .22 caliber rounds of ammunition. (Page
      43)

6.    .25 caliber gun (Raven Arms), magazine w/ six bullets, and one bullet (Page
      59)

7.    Ammunition for .22 caliber (Page 61)

8.    Ammunition (Page 61)

9.    Smokeless powder from Remington .30-06 Bronze Points (Page 47)

10.   Black Powder and Smokeless Powder (Page 55)

11.   "(Control Sample) One Winchester Super X Shotgun Round" (Page 6)

# BOMB-MAKING
# MATERIALS

1.   Plastic jar containing triggering devices (Page 6)
2.   Improvised explosive device (IED) (Page 12)
3.   Pipebomb (Page 12)
4.   trigger switch (Page 21)
5.   Bomb components (Page 23)
6.   metal tubes, wiring, springs, ball trigger, stapler, 9V battery, and small copper colored tubing (Page 24)
7.   Copper colored tubing (Page 24)
8.   Bottle marked "Calumet" containing white powder (Page 32)
9.   Plastic container with white clumpy powder (Page 32)
10.  Plastic bottle with black chunky material in paper and hand labeled "mezel #2, nuevo lote exp 103" (Page 32)
11.  Container of white powder labeled KC103 potassium 99.95% pure (Page 32)
12.  Container of white powder (page 32)
13.  Container of yellow crystals (Page 33)
14.  Container of white powder (Page 33)
15.  Six sealed bottles labeled sulfur (Page 33)
16.  Yellow powder labeled sulfur (Page 33)
17.  Jar of white crystalline substance and not ammonium nitrate (Page 33)
18.  One gallon jug labeled "abietic acid" (Page 33)
19.  Bottle labeled "ammonium nitrate" (Page 33)
20.  Two cans in bags labeled "abietic acid" (Page 33)
21.  Two bottles labeled as aluminum (Page 33)
22.  Various containers marked as "aluminum materials" (Page 33)
23.  One plastic container labeled "citric acid" containing white powder (Page 33)
24.  One plastic bottle containing metallic granular material (page 34)
25.  Calumet double action baking powder metal container containing a lump of metal (Page 35)
26.  One cut portion of a battery (Page 36)
27.  Small plastic container with brownish-black powder (Page 36)
28.  One brown plastic container containing trace material (Page 36)
29.  Glass jar with red metal lid containing clumps of silver substance (Page 38)
30.  One metal can containing misc pieces of copper (Page 38)

31.  One small brown plastic bottle with aluminum filings (Page 39)
32.  Small orange plastic container with Notation Ag Cl (Page 39)
33.  Bottle with label Manganese Dioxide (Page 39)
34.  Bottle with notation lithorgeiminium & free lead (Page 39)
35.  Orange container with notation Fe2 03 (Page 39)
36.  Small plastic tube containing blue powder (Page 39)
37.  Small glass jar with notation NH4 Cl Ammonium Chloride (Page 40)
38.  One small white plastic bottle with notation "lead chloride" (Page 40)
39.  Whitish bottle containing grey powder (Page 40)
40.  Small brown plastic bottle with label Na2 Co3 (Page 40)
41.  Whitish plastic bottle with notation Fe(OH)2 (Page 41)
42.  Small brown plastic bottle with notation lead acetate, lead hydroxide, lead carbonate (Page 41)
43.  One Calumet baking powder can with notation Fe 045 (Page 41)
44.  White bottle labeled HDC 0923-0371-03 Powdered Alum (Page 41)
45.  White plastic bottled labeled McKesson Boric Acid Crystals HF (Page 41)
46.  One "Grape Super Sip" bottle with notation Fe2 03 (Page 42)
47.  Small clear glass "Folgers" jar with greenish-grey crystals (page 42)
48.  White plastic McKesson Boric Acid Powder HF bottle (Page 42)
49.  One whitish plastic "Raspberry super sip" bottle with notation AgCl (Page 42)
50.  White bottle with notations (Page 42)
51.  Clear glass jar with notation "amorphous carbon" (Page 44)
52.  Metal can with notation "alder charcoal" (Page 44)
53.  Whitish plastic container with label potassium carbonate (Page 44)
54.  Rod shaped pieces of dark colored/blackish power (page 44)
55.  One small glass jar with small amount of gold, shiny granules and flakes (Page 46)
56.  Plastic bread bag with five small containers containing various chemicals (page 47)
57.  One tan plastic shopping bag containing three aluminum fail envelopes with notations (Page 47)
58.  One white plastic bag containing "flash powder" (Page 49)
59.  Round metal can with notation Na2CO3 (Page 49)
60.  One brown plastic bottle with notation crude KClO3 (Page 49)
61.  Blue powder substance (Page 50)
62.  White plastic bottle with notation CaSO4 (page 50)

63. Brown plastic bottle with notation "mostly Kcl" (Page 50)
64. One metal can containing large black particles (Page 50)
65. One glass bottle with label "McKesson Glycerin USP" (Page 50)
66. Liquid from bottle marked "Sodium Tartrate" (Page 50)
67. Liquid from bottle marked "KCl" (Page 50)
68. Whitish plastic bottle with label "McKesson Saltpeter (Potassium Nitrate) (Page 51)
69. Small brown bottle with notation "crude KCLO3 (Page 51)
70. One clear plastic bottle with notation "crude KCLO3" (Page 51)
71. One round cardboard and metal cannister containing silver-grey powder substance (Page 51)
72. Two small white cardboard boxes labeled "potassium chromate" (Page 51)
73. One white plastic shopping bag containing a white powdery substance (Page 51)
74. One small plastic container with notation BaSO4 (Page 52)
75. One clear glass jar with notation "Curic Hydroxide?" (Page 52)
76. Whitish plastic bottle with label "McKesson Boric Acid Crystals" (Page 52)
77. One white plastic bottle, with label "Flowers of Sulfur" (Page 52)
78. One large whitish plastic jar containing white powdery substance (Page 53)
79. Outer pipe with attached metal fragments (Page 53)
80. Pipe shaving and filler (Page 53)
81. End plug/metal fragments (Page 53)
82. Tape and twine, outer wrap of pipe (Page 53)
83. Improvised detonator and filler (Page 53)
84. Small orange plastic container with notation Silver oxide Ag2O (Page 54)
85. One small clear glass jar with notation "washed charcoal" (Page 54)
86. One small orange plastic container with notation Fe2O3 (Page 54)
87. One round metal can containing a powdery substance (Page 54)
88. One Quaker Yellow Corn Meal can containing white powdery substance (Page 54)
89. One white plastic jar labeled Tartaric acid (Page 54)
90. Plastic bucket containing thick black material (Page 55)
91. Metal container of black granular material (Page 55)
92. Metal container containing white powder material (Page 55)
93. Three plastic bottles labeled "alcohol" containing liquid (page 55)
94. Large plastic container labeled NaCl3 + NaCl (Page 57)
95. Bottle of white powder labeled NaCl (Page 57)

96.     Unknown powder (Page 57)
97.     Glass bottle containing clear liquid (page 57)
98.     One white plastic container of white powder (Page 58)
99.     Plastic container of white powder (Page 58)
100.    Two plastic containers with white crystalline material (Page 59)